UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO. 2:11-00109

DAVID LEE WALLACE

MEMORANDUM OPINION AND ORDER

Pending is defendant's motion to suppress evidence
filed June 2, 2011.

On June 16, 2011, the court conducted an evidentiary
hearing attended by William B. King, II, Assistant United States
Attorney, on behalf of the United States and defendant, who
appeared in person and by his counsel David R. Bungard, Assistant
Federal Public Defender.  The discussion following in section I
represents the court's findings of fact, made by a preponderance
of the evidence.  A portion of the June 16, 2011, hearing was
conducted ex parte to permit counsel for the United States to
question one of the law enforcement officers in the case about
information received from a confidential informant.

On August 2, 2011, the court granted, in part,
defendant's motion to compel disclosure of identities of
confidential informants.  Defendant was concerned in particular

that one or more of the confidential informants may have been "a crucial fact witness" respecting the circumstances surrounding defendant's pursuit and apprehension by law enforcement. After conducting the analysis prescribed by Roviaro v. United States, 353 U.S. 53, 64-65 (1957), and United States v. D'Anjou, 16 F.3d 604, 609 (4th Cir. 1994), the court concluded that defense counsel, but not his client, was entitled to learn the name and contact information for, and interview, the lone confidential informant who (1) was responsible for identifying defendant, and (2) perhaps witnessed the defendant's apprehension and arrest.

Defense counsel was directed to notify the court no later than August 17, 2011, respecting whether he wished to expand the record accompanying the motion to suppress. On August 12, 2011, after interviewing the confidential informant, counsel for defendant notified the court that he deemed it unnecessary to further supplement the evidentiary record and that the court could consider the matter submitted.

On August 15, 2011, the court directed that counsel for the defendant be provided a copy of the ex parte portion of the June 16, 2011, hearing. Counsel for both parties were directed to confer and report to the court respecting any necessary redactions that might be made to the transcript, so as to shield

2

the confidential informant's identity, prior to the transcript's release to defendant so that he might discuss it with his counsel.  Defense counsel was directed to advise the court no later than noon on August 19, 2011, whether defendant desired to reopen the record of the suppression hearing for purposes of supplementing the proceedings therein with any information or line of inquiry he deemed to arise from the redacted transcript.

On August 17, 2011, the court conducted a sealed hearing with counsel respecting a disagreement that had arisen between them concerning necessary redactions.  On August 19, 2011, the court learned that the parties had resolved their dispute.  On August 31, 2011, the court allowed counsel for defendant at his earliest convenience to disclose the redacted transcript to his client.  Counsel has not, since that date, requested to reopen the record or supplement the proceedings. Defendant's last opportunity to file a brief in this matter came on September 2, 2011, which was the deadline for his reply respecting his supplemental briefing on the motion to suppress. No reply was filed.

On September 8, 2011, counsel for both sides and the defendant appeared for a hearing at which time the court noted that it would make use of the redacted transcript and the

3

frequent traveler information as part of the record on the motion to suppress.  The court inquired if either the United States or the defendant wished to examine the witness, Lt. Chad Napier, who testified at the ex parte hearing, or whether either party wished to be heard or develop any matters, including evidence, related to the subject matter of the redacted transcript ordered disclosed to defendant by the court on August 31, 2011.  Inasmuch as the United States, and counsel for defendant, in his client's presence, advised that no further development, supplementation, or further proceedings were desired in this matter, the court deemed the record closed and submitted for decision.

I.

On April 7, 2011, detectives with the local Metro Drug Enforcement Network Team ("MDENT") received information from a confidential source that two black males, carrying heroin or prescription pills, would be traveling by Greyhound bus from Detroit, Michigan, to Charleston, West Virginia, with arrival around 7:00 a.m. on April 8, 2011.  The tip drew the attention of the officers receiving it inasmuch as they recognize Detroit as a major source -- indeed, the No. 1 source -- of illegal drugs transported to Charleston, West Virginia.  The Greyhound bus

**4**

terminal is considered by them to be a high crime area in that an estimated 6% of the drug interdictions made by MDENT come through the Greyhound bus terminal.  And 85% of the 6% represent interdiction of drugs coming from Detroit.

As a consequence, a group of seven officers was assembled at the Greyhound bus terminal to meet the bus carrying the two individuals when it arrived at the expected time of 7:20 a.m.  The group included Lt. Chad Napier and Sgt. William Winkler, who were in charge, and Detective David Richardson, Detective Tom Carper and Corporal Daniel Johnson.

None of the officers were in uniform except for an unnamed officer who was distant from the scene.  Detective Carper was inside the bus terminal.  The bus terminal fronts on Reynolds Street, which is one block long.  The terminal is bordered on the south by Lee Street and on the north by Washington Street. Detective Richardson was at his unmarked Ford Explorer parked across Lee Street on the Civic Center property from which he could see the front entrance to the bus terminal.  Sgt. Winkler and Lt. Napier were located in their vehicle on a parking lot across Washington Street.  From their vantage point they could observe the Reynolds Street entrance to the bus terminal.  Det. Richardson on the south and Lt. Napier and Sgt. Winkler on the north were 100 feet or more away from the bus terminal entrance.

When the passengers exited the bus in the loading/unloading area and entered the waiting area on their way to the front entrance, Det. Carper was advised by a confidential informant that a black male who departed the bus was a frequent traveler from Detroit to Charleston.[1]  The confidential informant was not the same individual as the cooperating source whose tip about two black males prompted the officers' surveillance.

Although the officers did not detect two black males exiting the bus as they had been informed, they did observe one black male, identified as the frequent traveler, and who proved to be the defendant, David Wallace, depart from the bus and act in a suspicious manner.  He was the first to leave the terminal, carrying a black duffel bag over his shoulder.  He exited onto Reynolds Street where he paused for a moment looking around nervously.  The suspicion of the officers was further aroused by

---

[1]In an August 2, 2011, memorandum opinion and order, the court noted that it did not intend, at that time, to rely, "in resolving the motion to suppress, . . . upon the search warrant information, the drug courier information, or the frequent traveler information" discussed herein (Memo. Op. and Ord. at 7). It has now become necessary to do so in order to fully discuss the circumstances surrounding the April 8, 2011, stop by law enforcement.  The frequent traveler information is also important inasmuch as it serves as one of the features that distinguish the circumstances of this case from the recently published decision in United States v. Massenburg, No. 10-4209, --- F.3d ---, 2011 WL 3559897 (4th Cir. Aug. 15, 2011).

the fact that he was not met by anyone to transport him by car as is ordinarily observed by the officers with respect to departing passengers at the bus terminal.

As the defendant left the bus terminal, he walked at a rapid pace south on Reynolds Street to Lee Street, still looking about nervously at vehicles and others in the area. He proceeded east on Lee Street for a short distance and crossed over to the south side of Lee Street. He continued walking east towards the Town Center Mall located a block away. Sgt. Winkler radioed Det. Richardson to follow the defendant. Det. Richardson did so by driving his Ford Explorer onto Lee Street and into the lane of traffic adjoining the sidewalk on which the defendant was walking. Sgt. Winkler then added the further command that Det. Richardson approach the defendant.

In response, Det. Richardson drove his vehicle to a point just beyond the defendant and got out of his vehicle at which time the defendant turned and walked in the opposite direction, back towards the terminal. With Det. Richardson at the rear driver's side of his vehicle and the defendant some 12 to 17 feet away and looking back at him, Det. Richardson asked if he could speak to the defendant, announcing that he was a police officer and showing his badge. At that point the defendant broke into a run. Det. Richardson then ordered the defendant to stop.

7

From there the defendant ran back to Reynolds Street and proceeded across Washington Street toward the parking lot where Officers Napier and Sgt. Winkler were located.  They exited their vehicle and called out to the defendant, "Police - stop." Defendant ran back along Reynolds Street and jumped on and over a broken down fence that covered an entrance to the loading/ unloading area of the terminal.  With Lt. Napier in pursuit, the defendant ran back toward the entrance to the waiting area at which point he was met and grabbed by Det. Carper and then by Lt. Napier who with the weight of his body forced the defendant toward the floor of the loading/unloading area.  The defendant was resisting in what the officers concluded was a continuing effort to flee.

As the defendant struggled with Officers Napier and Carper, the black duffel bag that he had been carrying over his shoulder fell beneath him.  At that point Det. Richardson, who did not know whether the defendant had weapons in the bag or whether the defendant was trying to get into the bag or just what the defendant was doing, jerked the bag from under the defendant who was still struggling.  When Lt. Napier ordered one of the officers to "tase" the defendant, he quit resisting.  The defendant was restrained by handcuffs behind his back and placed

8

under arrest for obstructing the officers.  When Det. Richardson asked about the bag and its contents, defendant said it was not his.  When asked his name, the defendant said Daveion.  He was then transported to the Charleston Police Department booking office.

At the time of his arrest, the defendant had on his person a bus ticket in the name of Daveion Walker.  At the booking office an officer provided the name of the defendant as being Lawrence Gillcrest.  A check by the officers revealed information indicating that the name Gillcrest did not apply to the defendant who then admitted that his name was David Wallace. The officers were able to confirm the defendant's name as being David Wallace through the Department of Corrections by virtue of a tattoo on his chest.

Det. Richardson obtained a search warrant for the duffel bag.  Upon searching the bag, law enforcement officers found 529 hydrocodone pills and 121 alprazolam pills.  About 45 minutes after arriving at the booking office, the defendant volunteered that the duffel bag belonged to him and agreed to talk to the officers.  He was given the usual <u>Miranda</u> warnings and signed a waiver form with respect to those warnings.  He then advised the officers, as set forth on the written memorandum of

questions and answers prepared by Det. Richardson, that he did not know how many pills he had in the duffel bag, that the pills were the kind he uses and that the pills he uses are "Tabs and Xanis." When asked where he got the pills, the defendant said he bought them "off the street" in Detroit, and then said "I didn't pay nothing for them." The defendant added that he uses the pills and doesn't sell them. The defendant refused to sign the written memorandum.

Inasmuch as the defendant was charged with the felony offense of possession of controlled substances with intent to distribute, Det. Richardson followed his usual practice in not also charging the defendant with the lesser misdemeanor offense of obstruction of justice, though that lesser offense would appear in the report and could be added at a later time.

II.

A.  Governing Fourth Amendment Standards

The Fourth Amendment protects the citizenry "against unreasonable searches and seizures." U.S. Const. amend. IV.  At the same time, "[o]fficial conduct that does not 'compromise any

10

legitimate interest in privacy' is not a search subject to the
Fourth Amendment." Illinois v. Caballes, 543 U.S. 405, 408
(2005) (quoting in part United States v. Jacobsen, 466 U.S. 109,
123 (1984)).  So it is critical to first properly characterize
any police-citizen encounter in order to ascertain if the Fourth
Amendment threshold has been crossed.  Our court of appeals has
observed as follows:

> The Supreme Court has recognized three distinct types
> of police-citizen interactions: (1) arrest, which must
> be supported by probable cause; (2) brief investigatory
> stops, which must be supported by reasonable
> articulable suspicion; and (3) brief encounters between
> police and citizens, which require no objective
> justification.

United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)
(citations omitted).

Respecting arrest, the probable cause standard is "an
objective one; it exists when, at the time the arrest occurs, the
facts and circumstances within the officer's knowledge would
warrant the belief of a prudent person that the arrestee had
committed or was committing an offense." United States v.
Johnson, 599 F.3d 339, 346 (4th Cir. 2010)(citation and internal
quotation marks omitted); Gerstein v. Pugh, 420 U.S. 103, 111
(1975).  The existence of probable cause "always turns on two
factors in combination: the suspect's conduct as known to the
officer, and the contours of the offense thought to be committed

by that conduct." <u>Pritchett v. Alford</u>, 973 F.2d 307, 314 (4th Cir. 1992).

Respecting investigatory stops, law enforcement may detain a person for brief inquiry when supported by reasonable suspicion arising from articulable facts indicative of criminal misconduct. <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123-24 (2000); <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). Reasonable suspicion depends upon the totality of the circumstances, including what the officer knows and any reasonable inferences that might be drawn when the stop occurs. <u>United States v. Sokolow</u>, 490 U.S. 1, 8 (1989); <u>United States v. Black</u>, 525 F.3d 359, 364-65 (4th Cir. 2008). Importantly, reasonable suspicion may exist despite the fact that "each individual factor 'alone is susceptible of innocent explanation.'" <u>Black</u>, 525 F.3d at 365 (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 277 (2002)). In particular, evasive behavior and alarmed reaction support a reasonable suspicion of criminal activity. <u>United States v. Smith</u>, 396 F.3d 579, 584 (4th Cir. 2005); <u>United States v. Humphries</u>, 372 F.3d 653, 657 (4th Cir. 2004); <u>United States v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993).

At the lowest rung of the Fourth Amendment hierarchy is the third category, namely, those "voluntary citizen-police

encounters [that] do not implicate the Fourth Amendment" at all. Black, 525 F.3d at 364.  As indicated by its text, the Fourth Amendment is concerned with unreasonable searches and seizures of citizens.  A seizure, however, "does not occur simply because a police officer approaches an individual and asks a few questions."  Florida v. Bostick, 501 U.S. 429, 434 (1991). Absent a seizure, a police-citizen encounter is considered consensual and "will not trigger Fourth Amendment scrutiny." Id. at 439; United States v. Farrior, 535 F.3d 210, 218 (4th Cir. 2008)("Under Bostick, the question is whether a reasonable person would have felt free to decline the officer's request or otherwise terminate the encounter.").  Additionally, in both United States v. Drayton,  536 U.S. 194, 204 (2002), and Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984), the Supreme Court observed that a seizure did not occur simply because law enforcement approached an individual, displayed their badges, and started asking questions.

With these general standards in mind, the court examines the April 8, 2011, incident in a step-by-step manner.

13

B.   Law Enforcement Presence at the Bus Terminal

        While it does not implicate the Fourth Amendment, it is worth noting from a contextual perspective that law enforcement was legitimately present at the bus terminal on April 8, 2011. They were surveilling a transportation portal responsible for a substantial amount of illegal drug activity in the city. Further, they were awaiting the imminent arrival of a bus from Detroit, a frequent and proven pipeline for introducing controlled substances into the Charleston area.

        It is likewise immaterial that their surveillance ultimately focused upon defendant.[2]  He was not, to their

_____

        [2]During the June 16, 2011, sealed, ex parte hearing, counsel for the United States questioned Det. Napier respecting the confidential informant who advised Det. Carper defendant was a frequent traveler from Detroit to Charleston.  Det. Napier's testimony established beyond peradventure the reliability of the confidential informant.  At one point, however, he added, "We would not have approached th[e defendant] if it wouldn't have been for" the confidential informant's tip concerning defendant's frequent travels between Detroit and Charleston.
        The confidential informant's statement, and the observation by Det. Napier, play no role in the purely objective Fourth Amendment analysis.  As the Supreme Court reiterated just months ago:

        "Our cases have repeatedly rejected" a subjective
        approach, asking only whether "the circumstances,
        viewed objectively, justify the action."  Indeed, we
        have never held, outside limited contexts such as an
                                        (continued...)

knowledge, doing anything unlawful at the time.  Nevertheless,
his activities justifiably aroused some suspicion based upon his
early exit from the terminal, nervous demeanor, and the fact no
one arrived to drive him from the terminal.  There is no
constitutional prohibition against law enforcement watching, or
following, particular individuals in high-crime areas.  <u>See</u> <u>Katz</u>
<u>v. United States</u>, 389 U.S. 347, 351 (1967)("What a person
knowingly exposes to the public, even in his own home or office,
is not a subject of Fourth Amendment protection."); <u>United States</u>
<u>v. Taylor</u>, 90 F.3d 903, 908 (4th Cir. 1996) ("[A] law enforcement
officer's observations from a public vantage point where he has a
right to be and from which the activities or objects he observes
are clearly visible do not constitute a search within the meaning
of the Fourth Amendment.") (citations and quotations omitted).

---

[2](...continued)
"inventory search or administrative inspection . . .,
that an officer's motive invalidates objectively
justifiable behavior under the Fourth Amendment."

<u>Kentucky v. King</u>, 131 S. Ct. 1849, 1859 (2011) (citations
omitted).
    In keeping with this principle, it is immaterial whether
Det. Napier would or would not have directed a fellow officer to
approach defendant.  The approach was entirely permissible from
an objective standpoint and hence transgressed no Fourth
Amendment boundary line.

15

C.    The Request to Speak with Defendant and Display of the Badge


        The next event of consequence is the brief encounter between Det. Richardson and defendant.  Det. Richardson identified himself as a law enforcement officer, displayed has badge, and asked to speak with defendant.  This is best characterized as the beginnings of a police-citizen meeting without Fourth Amendment consequence.  A reasonable person would have felt free to decline Det. Richardson's request.


D.    Defendant's Hurried Departure and the Ensuing Chase


        Upon seeing Detective Richardson, defendant turned and began walking back toward the terminal area.  There was nothing illegal about this change of course.  It would serve, however, to further justify the suspicions of law enforcement earlier aroused.  Those suspicions would then have blossomed significantly when defendant commenced his headlong run.  Law enforcement was entitled to give chase under the circumstances without offending the Fourth Amendment.  See  California v. Hodari D., 499 U.S. 621, 625-26 (1991)("Hodari contends (and we accept as true for purposes of this decision) that Pertoso's pursuit qualified as a 'show of authority' calling upon Hodari to

16

halt.  The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not."); United States v. Brown, 401 F.3d 588, 594 (4th Cir. 2005) ("A defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated.").

E.   Defendant's Apprehension

        Following the extended chase, Det. Carper and Lt. Napier forced defendant to the ground.  At this precise point, defendant was unquestionably seized within the contemplation of the Fourth Amendment.  Compare United States v. Drayton, 536 U.S. 194, 201 (2002) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."); Brown, 401 F.3d at 594 (noting "[A] seizure 'requires either physical force . . . or, where that is absent, submission to the assertion of authority.'") (citation omitted).

        The court does not deem the stop, at least at this point, to have constituted an arrest.  It is best treated as a Terry stop.  The question thus arises whether a Terry stop was

17

justified under the circumstances.[3]  The Supreme Court has articulated factors to be weighed in considering the totality of the circumstances that might support the reasonable suspicion necessary to justify a Terry stop.  These factors include: (1) whether a high crime area is involved, Adams v. Williams, 407 U.S. 143, 147 (1972), (2) whether an individual exhibits evasive behavior, United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975), and (3) whether there is unprovoked flight, Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) ("Headlong flight -- wherever it occurs -- is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

Each of these factors was present at the time defendant was stopped.  Additionally, as noted, defendant (1) made an early exit from the terminal after arriving from a city on the supply end of a significant drug pipeline, (2) exhibited nervous demeanor at the time, and (3) summoned no one to drive him from the location.

_____

[3]While the parties do not raise the point, it is well settled that objectively reasonable physical force, as employed here, may be used to accomplish a Terry stop.  See, e.g., United States v. Haye, 825 F.2d 32, 35 (4th Cir. 1987)("By its very nature . . . a Terry stop is involuntary, and the suspect is not free to avoid it by flight.  To that extent, his freedom is limited, and the policeman is authorized to use such reasonable force as may be necessary to accomplish the purpose of the limited stop.").

Based upon the totality of the circumstances, defendant's actions objectively raised a suspicion that he was engaged in wrongdoing.  Indeed, the circumstances are very similar to those under which our court of appeals found reasonable suspicion in Haye.  Haye, 825 F.2d at 34 (involving individuals who, instead of declining to answer questions and walking away, panicked and fled, giving officers "reasonable suspicion for a brief, involuntary, investigative stop.").[4]

F.    Defendant's Struggle and Arrest

Upon being taken to the ground, defendant continued to resist the law enforcement officers.  He did so until learning of

---

[4]At defendant's request, the court permitted supplemental briefing respecting United States v. Massenburg, No. 10-4209, ---F.3d ----, 2011 WL 3559897 (4th Cir. Aug. 15, 2011).  Defendant asserts, based upon Massenburg, that the Terry stop was unjustifed.  There are several material differences between this case and Massenburg, not the least of which is that the Massenburg suspects, when approached by law enforcement, "were not evasive; . . . continued walking forward, toward the car, and voluntarily paused to speak with the officer upon the officer's request." Id., 2011 WL 3559897, at *1.  Also, the anonymous informant in Massenburg gave no description of a perpetrator.
    Law enforcement in this action, however, already knew from an informant that defendant was a frequent traveler within the drug pipeline between Detroit and Charleston.  In sum, this is not a situation where the "Government [has] attempt[ed] to spin . . . mundane acts into a web of deception." United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011).

the imminent use of a Taser™ device.  He was then placed under
arrest for obstruction.  West Virginia Code section 61-5-7(a)
provides pertinently as follows:

> Any person who by . . . acts or otherwise, forcibly . .
> . obstructs, or attempts to . . . obstruct, any
> law-enforcement officer . . . acting in his or her
> official capacity is guilty of a misdemeanor . . . .

W. Va. Code § 61-5-7(a).

In State v. Carney, 222 W. Va. 152, 663 S.E.2d 606
(2008), the Supreme Court of Appeals of West Virginia observed
that "the key" to a section 61-5-7(a) obstruction is "the 'direct
interference with the officer in the discharge of his official
duties.'"  Id. at 156, 663 S.E.2d at 610.  Later in the opinion,
the West Virginia court "set forth the parameters of what
qualifies as a statutory obstruction -- forcible or illegal
conduct that interferes with a police officer's discharge of
official duties."  Id. at 156, 663 S.E.2d at 610.

In attempting to effect the Terry stop, the law
enforcement officers were discharging their official duties.  In
maintaining his persistent struggle to the point that use of an
electroshock weapon was authorized, it is apparent that defendant
was interfering with the discharge of the officers' duties to
gain control of the situation and make inquiry of him as
permitted by Terry.

20

As a result, the facts and circumstances within the law enforcement officers' knowledge warranted the objective belief that defendant was committing the misdemeanor statutory obstruction offense, justifying his arrest.  <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); <u>Maryland v. Pringle</u>, 540 U.S. 366, 370 (2003) ("A warrantless arrest of an individual in a public place for a . . . misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause"); <u>United States v. McNeill</u>, 484 F.3d 301, 310-11 (4th Cir. 2007)(recognizing rule).

Given the lawful arrest, it was likewise permissible to search defendant's person incident thereto.  <u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969) (concluding that search incident to lawful arrest does not violate Fourth Amendment); <u>United States v. Kellam</u>, 568 F.3d 125, 136 (4th Cir. 2009).  It was thus proper to remove the bus ticket from defendant's pocket.

G.    Seizure and Search of Defendant's Bag


First, it was permissible for the law enforcement officers to move, and hence seize, defendant's bag and place it out of his reach during the struggle while they brought order to the situation in an attempt to conduct the Terry stop.  See United States v. Place, 462 U.S. 696, 706 (1983)(stating "[W]e conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of Terry and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion . . . .").

Second, the search of the bag must be scrutinized. Defendant unambiguously denied ownership of the item at the time of his arrest.  That was a disavowal of consequence according to binding precedent:

> We recently stated in United States v. Leshuk that
>
>> a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property.
>
> 65 F.3d 1105, 1111 (4th Cir.1995). The Leshuk defendants denied owning a bag when sheriff's deputies approached.  Denial of ownership, we held, constitutes abandonment.

United States v. Han, 74 F.3d 537, 543 (4th Cir. 1996); United States v. Denny, 441 F.3d 1220, 1227 (10th Cir. 2006)("Defendant does not cite and we have not found a case in which a defendant's express disclaimer of ownership in response to a lawful police inquiry did not constitute abandonment of property in the Fourth Amendment context."); 1 Joseph G. Cook, Constitutional Rights of the Accused § 4:6 (3rd ed. elec. 2010) ("Property which has been . . . abandoned harbors no privacy interest of its former holder, and therefore its seizure does not give rise to a Fourth Amendment claim.").

Inasmuch as defendant abandoned ownership of the bag, he retained no reasonable expectation of privacy therein.  The law enforcement officers were thus authorized to search it.

In light of this disposition, a further matter warrants discussion.  The court does not understand defendant to assert that his denial of ownership, or providing his name for that matter, resulted from a Miranda violation.  (See, e.g., Def.'s Mem. in Supp. at 17 ("In this case, all of the responses made by the defendant were done as a direct result of the interrogation initiated by Detective Richardson while the defendant was in custody at the police station and not from any spontaneous statement from the defendant.") (emphasis added)).

23

Assuming defendant successfully demonstrated that the denial of ownership arose from custodial interrogation without prophylactic warnings, any attempt to exclude the evidence obtained therefrom would be foreclosed by binding precedent. See, e.g., United States v. Patane, 542 U.S. 630, 643 (2004); United States v. Sterling, 283 F.3d 216, 219 (4th Cir. 2002)(noting "'derivative evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never "fruit of the poisonous tree."'") (quoting United States v. Elie, 111 F.3d 1135, 1142 (4th Cir. 1997)).

H.   Post Arrest Incriminating Statements

Defendant also seeks an order suppressing for trial any post-arrest incriminating statements he made to law enforcement. The court does not now address the admissibility at trial of defendant's statements, immediately following his arrest near the terminal, respecting his false name and disavowal of ownership of the bag. The parties have not had occasion to be fully heard on the matter and it may properly await in limine disposition shortly before trial.

24

Respecting the other post-arrest statements made by defendant at the station, however, suppression is inappropriate. Following the search of the bag, defendant volunteered that it belonged to him and he agreed to talk to the officers.  These statements were not the product of custodial interrogation.  He was then given <u>Miranda</u> warnings and signed a waiver form.  His statements thereafter were thus not obtained in violation of the Fifth Amendment.

## III.

Based upon the foregoing discussion, the court does not discern any constitutional violation arising out of the pursuit, search or seizure of defendant's person, the bus ticket, or the bag.  The same is true of the post-arrest statements given by defendant, save for those statements made by him in or near the terminal, the lawfulness of which may be determined following further development by the parties if defendant chooses to challenge the admissibility at trial of the statements made by him at the terminal.

The court, accordingly, ORDERS that defendant's motion to suppress be, and it hereby is, denied.

25

The Clerk is directed to forward copies of this written opinion and order to all counsel of record, the defendant, and the United States Probation Officer.

DATED: September 9, 2011

John T. Copenhaver, Jr.
United States District Judge